JDM 5.18.23
KOG/MM:2019R0573

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

YURI LEVCHUK,

Defendant

CRIMINAL NO. SAG-23-184
(Theft of Trade Secrets, 18 U.S.C.
§ 1832(a)(1); Unauthorized Possession
of Trade Secrets, 18 U.S.C.
§ 1832(a)(3); Forfeiture, 18 U.S.C. §§
981(a)(1)(C), 1834, and 2323, 21 U.S.C.
§ 853(p), 28 U.S.C. § 2461(c))

*******

## INDICTMENT

## COUNT ONE

(Theft of Trade Secrets)

The Grand Jury for the District of Maryland charges that:

### Introductory Allegations

At all times relevant to this Indictment:

    A.    <u>Relevant Persons and Entities</u>

    1.    **YURI LEVCHUK** ("**LEVCHUK**") was a resident of Potomac, Maryland. From approximately July 18, 2008, until June 11, 2019, **LEVCHUK** was employed as a systems engineer in the Research and Technology Division at Victim Company A ("Company A").

    2.    Company A was a multinational corporation that was engaged in the business of designing and manufacturing military and commercial airplanes, as well as various security and

aerospace systems and products. Company A, through a wholly-owned subsidiary, maintained a research and development facility in Germantown, Maryland.

3. Intelligent Models, Inc. ("IMI") was a Maryland corporation with an office address in Rockville, Maryland. **LEVCHUK** formed IMI on or about November 3, 2006. IMI was engaged in the business of obtaining Small Business Innovation Research (SBIR) grants from the Department of Defense for the development of various artificial intelligence software programs from on or about November 3, 2006, until the company's dissolution on or about November 5, 2018.

4. Intelligent Models Plus, Inc. ("IMP") was a Virginia corporation with an office address in Alexandria, Virginia. After IMI ceased operating, **LEVCHUK** formed IMP on or about January 31, 2018, in order to continue his business of applying for SBIR grants with the Department of Defense. **LEVCHUK** operated IMI and paid Individual 1 to serve as the president of the company.

B. <u>Company A - Trade Secrets and Security Protections</u>

5. Company A was a prominent leader in the research, development and implementation of artificial intelligence computer programs for use in military and commercial applications. Over the course of multiple years and expenditure of its own resources, Company A researched and developed a proprietary computer technology, hereinafter referred to as "Trade Secret 1," that was designed to gather, search and fuse large amounts of data and information into searchable content. Trade Secret 1 leveraged mathematical models to analyze collected data and created a unique narrative, which organized and displayed the data in an easy to understand format. The proprietary technology incorporated commercially off the shelf, open source, government, and proprietary software developed by Victim Company A.

6. Company A considered the composition of Trade Secret 1, as well as some of the components themselves, to be confidential, proprietary information and a highly valuable trade secret. Trade Secret 1 was designed to perform the following functions:

   a. An analytic module, which incorporated Artificial Intelligence, machine learning algorithms, and other modules to gather and interpret data. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes;

   b. A video analytics module, which processes image segmentations, detects objects and events, persistently tracks objects, recognizes and describes an object's behavior, and classifies objects. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes;

   c. A video explorer module, which includes a video browsing, search, and forensic analysis of object behavior. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes;

   d. A video to story translation and analytics module, which includes a full motion video analytics capability in order to persistently track objects and events, detect anomalies, summarize video into natural language text, and attempts to predict events. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes;

   e. A graph propagation module, which includes the ability to model adversarial activities. It included patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes;

    f. A detection module, which includes a multi-object tracker. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes;

    g. a signals intelligence module, which translates and incorporates intercepted communications data in order to provide a more comprehensive analysis and increase aggregate information value. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes; and

    h. an open source intelligence module, which gathers social media data in order to provide a more comprehensive analysis and increase aggregate information value. It included algorithms, data, patterns, plans, compilations, designs, methods, techniques, processes, procedures, programs, documents or source codes.

7. Trade Secret 1 derived independent economic value from not being generally known to, and not being readily ascertainable through proper means, by another person. An individual who stole or possessed without authorization Trade Secret 1 would obtain economic benefit from the disclosure and use of the information.

8. Trade Secret 1 was related to products and services used in and intended for use in interstate and foreign commerce.

9. Company A maintained a range of significant and reasonable security measures to keep Trade Secret 1 secret. Company A derived identifiable independent economic value, both actual and potential, by keeping Trade Secret 1 not generally known and not readily ascertainable through proper means by the public and its competitors.

10. Company A protected the confidential information relating to its proprietary technology, including Trade Secret 1, to prevent disclosure and unauthorized use, by a variety of measures, including but not limited to the following:

    a. Password protected computers;

    b. Segmented access to main file storage servers with access limited to certain employees;

    c. Company A secured its facilities in Germantown, Maryland with controlled access to their facility via an electronic card reader and escorted access to the premises for visitors.

    d. Company A required employees with routine access to the confidential and proprietary information to sign a nondisclosure agreement, which restricted the use of all confidential and proprietary information to the performance of employment duties related to Company A;

    e. Company A maintained explicit policies to ensure its ownership of all intellectual property and data developed by its employees, including software programs and architecture, computer source codes and inventions.

    f. Company A conducted periodic mandatory training for its employees on those policies as well as the handling of confidential and proprietary information, scientific and business standards of conduct, and responsible research conduct, among other topics.

    B. <u>The Theft and Unauthorized Use of Trade Secret 1</u>

11. Throughout the time period of his employment with Company A, **LEVCHUK** worked primarily out of his residence in Potomac, Maryland, and periodically at the research and development facility in Germantown, Maryland. Company A provided **LEVCHUK** with a company owned laptop computer and cellular telephone. **LEVCHUK** was able to connect to Company A's computer system and server via Company A's virtual private network ("the VPN"), which used a two-step authentication feature that required **LEVCHUK** to insert his Company A identification card into a card reader and to provide a password.

12. When he started his employment at Company A in July, 2008, **LEVCHUK** signed a Company A Intellectual Property and Confidentiality Agreement in which he agreed, among other things, that all proprietary information that he conceived or developed during his employment would be the exclusive property of Company A and that, at the time of the termination of his employment with Company A, he would return to Company A all materials in his possession that contained proprietary information.

13. Throughout his tenure with Company A, **LEVCHUK** received frequent training on information security, protection of intellectual property, trade secrets and proprietary information. Among other things, that training advised Levchuk that he was not permitted to remove, copy or download Company A's proprietary information onto personal storage devices without prior Company A authorization. On an annual basis, **LEVCHUK** also signed the Company A Code of Conduct in which he agreed that he would not seek personal gain through the inappropriate use of Company A non-public information.

14. Beginning on or before June 15, 2009, and continuing until at least August 12, 2019, **LEVCHUK** took and used, without authorization, Trade Secret 1 information in connection with applications for SBIR grants in the name of IMI or IMP. For each of the grants

6

that were awarded to IMI or IMP, **LEVCHUK** produced and transmitted to the particular DOD entity written reports that included various Trade Secret 1 information, schematics and concepts. In all, IMI received a total of $2,712,464 and IMP received a total of $449,046 pursuant to those SBIR grants.

15. Beginning on or about February 13, 2018, and continuing until at least June 10, 2019, **LEVCHUK** downloaded or otherwise transferred onto various personal electronic storage devices more than 500,000 files from Company A's secure network, including files that contained Trade Secret 1 and components of Trade Secret 1, without authorization.

16. Between on or about May 19, 2018, and June 10, 2019, in the District of Maryland and elsewhere,

## YURI LEVCHUK

the defendant, with the intent to convert a trade secret that was related to products and services used in and intended for use in interstate and foreign commerce, to the economic benefit of a person other than the owner of the trade secret, and knowing and intending that the offense would injure the owner thereof, knowingly did steal and without authorization appropriate, take, carry away, and conceal such information, to wit: Trade Secret 1.

18 U.S.C. § 1832(a)(1)

## COUNT TWO

(Unauthorized Possession of Trade Secrets)

The Grand Jury for the District of Maryland further charges:

1. The allegations in Paragraphs 1 through 15 of Count One are re-alleged and incorporated herein.

2. Between on or about May 19, 2018, and September 17, 2019, in the District of Maryland and elsewhere,

## YURI LEVCHUK

the defendant, with the intent to convert a trade secret that is related to products and services used in and intended for use in interstate and foreign commerce, to the economic benefit of a person other than the owner of the trade secret, and knowing and intending that the offense would injure the owner thereof, knowingly did receive and possess such information, knowing the same to have been stolen and appropriated, obtained, and converted without authorization, to wit: Trade Secret 1.

18 U.S.C. § 1832(a)(3)

## FORFEITURE NOTICE

The Grand Jury for the District of Maryland further finds that:

1. Pursuant to Rule 32.2, Fed. R. Crim. P., notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. §§ 981(a)(1)(C), 1834 and 2323, 21 U.S.C. § 853(p) and 28 U.S.C. § 2461(c), as a result of the defendant's conviction on any count in this Indictment.

2. Upon conviction of any of the offenses alleged in this Indictment, the defendant,

## YURI LEVCHUK

shall forfeit to the United States, pursuant to 18 U.S.C. §§ 1834 and 2323, (a) any article, the making or trafficking of which is, prohibited under Title 18, United States Code, Chapter 90; (b) any property used, or intended to be used, in any manner or part to commit or facilitate the commission of the offense; and (c) any property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of the offense, and pursuant to 18 U.S.C. §§ 981(a)(1)(C), 1832 and 2323, and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the commission of the offense.

3. The property to be forfeited includes, but is not limited to, the following:

    a. Western Digital external hard drive, serial number WX71DB708SPR;

    b. Western Digital external hard drive with charger, serial number WCAU30;

    c. Western Digital external hard drive, serial number WXT1E840XNRC;

    d. Seagate external hard drive, serial number NAOLNP5N;

    e. Seagate hard drive, Model SRDONF2, serial number NA8EQ9KX;

    f. Dell laptop, Model P14E, serial number FF3Z3S1;

    g. Backup Plus Desktop hard drive, serial number NA7EKLYG;

   h.  Dell laptop, serial number KOOW24703RG;

   i.  WD My Passport Ultra hard drive, serial number WXT1E840XNRC;

   j.  Dell Inspiron laptop, service tag number 785SR71; and

   k.  Verbatim USB device, 64 GB, serial number ADF07OO61B99AE45214.

  4. If any of the property described above, as a result of any act or omission of the defendant:

   a.  cannot be located upon the exercise of due diligence;

   b.  has been transferred or sold to, or deposited with, a third party;

   c.  has been placed beyond the jurisdiction of the court;

   d.  has been substantially diminished in value; or

   e.  has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

18 U.S.C. §§ 981(a)(1)(C), 1834, 2323;
21 U.S.C. § 853(p);
28 U.S.C. § 2461(c);
Fed. R. Crim. P. 32.2

                    _____
                    Erek L. Barron
                    United States Attorney for the
                    District of Maryland

A TRUE BILL:

5/18/23

**SIGNATURE REDACTED**

_____
Foreperson